UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                        Criminal No. 08-15 (ADM/FLN)

        Plaintiff,

        v.                                                          **REPORT AND
RECOMMENDATION**

Liqing Liu, 01,
Craig Joseph Kraft, 02,

        Defendants.

_____

Erika R. Mozangue, Assistant United States Attorney, for the Government.
Caroline Durham, Assistant Federal Defender, for Defendant Liu.
Steve L. Bergeson for Defendant Kraft

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on March 5 and

7, 2008, on Defendant Liu's Motion to Suppress Evidence Obtained as a Result of Search and Seizure

[#37], Defendant Liu's Motion to Suppress Statements, Admissions, and Answers [#38],  Defendant

Kraft's Motion for Suppression of Evidence Obtained as a Result of Search and Seizure  [#47], and

Defendant Kraft's Motion for Suppression of Admissions or Confessions [#58]. The Court received seven

exhibits from the Government[1] and two exhibits from Defendant Liu.[2]   The Court received testimony from

_____

[1]   Ex. 1        Search warrant application with supporting affidavit, search warrant, and search
                          warrant return for an apartment on Arona Street in Saint Paul, MN.
        Ex. 2        Search warrant application with supporting affidavit, search warrant, and search
                          warrant return for an apartment on Park Commons Drive in Saint Louis Park,
                          MN.
        Ex. 3        Search warrant application with supporting affidavit, search warrant, and search
                          warrant return for a 2004 white Kia Sorrento.
        Ex. 4        Waiver of rights form signed by Defendant Liu.
        Ex. 5        Notice to appear for removal proceedings for Defendant Liu.

Immigration and Customs Enforcement ("ICE") Special Agent ("SA") Jeremy Christenson, Minneapolis

Police Sgt. Matthew Wente, and Minneapolis Police Sgt. Grant Snyder.   Defendant Kraft submitted a

memorandum in support of his motions [#75] on March 14, 2008, and the Government submitted a

memorandum in opposition [#81] on March 21, 2008.  Defendant Liu submitted a memorandum in support

of his motions [#80] on March 20, 2008, and the Government submitted a memorandum in opposition [#

83] on March 25, 2008.  The matter was referred to the undersigned for Report and Recommendation

pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons which follow, this Court recommends

that Defendants' motions be granted in part and denied in part.

## I.   FINDINGS OF FACT

### A.      Affidavit in Support of Search Warrants

On December 12, 2007, SA Christenson submitted an single affidavit in support of three different

search warrants.  (*See* Exs. 1-3.)  The search warrants sought to search two apartments and one vehicle.

SA Christenson has been a Special Agent with ICE since March of 2006.  Prior to joining ICE, SA

Christenson worked for nine years as a police officer and for four years as a federal air marshal.

SA Christenson's affidavit describes an investigation into organized prostitution in the

Minneapolis/Saint Paul area.  The prostitution occurred at brothels throughout the metropolitan area.  The

---

|         |                                                                                          |
|---------|------------------------------------------------------------------------------------------|
| Ex. 6   | Waiver of rights form signed by Defendant Kraft.                                          |
| Ex. 7   | Video recording of statement obtained from Defendant Kraft on December 13, 2007          |

[2] Ex. 1    Video of traffic stop of Defendant Liu.

Ex. 2    Affidavit of Jeremy L. Christenson in support for a tracking device from November 7, 2007.  This document was also submitted as Addendum B to Defendant Liu's memorandum in support of his motions [#80].

investigation revealed that many of the prostituted women did not have legal status to be in the United States.  Furthermore, many of the women traveled from other cities within the United States and only stayed in Minnesota for a relatively short period of time.

SA Christenson indicated he suspected a brothel was located on First Avenue South in Minneapolis.  A confidential witness used by SA Christenson stated that Defendant Liu operated this brothel.  SA Christenson obtained a telephone number that he believed to be associated with the suspected brothel on First Avenue South.  A search of the classified advertisements in the Citypages newspaper showed that this number was used in a classified ad for massage services.  Classified ads for massage services in the Citypages are commonly known to be advertisements for prostitution.   A search of telephone subscriber information lists revealed that this telephone number was registered to Defendant Liu's wife, Xianghua Liu.

On July 18, 2007, a search warrant was served upon the Citypages newspaper.  The advertising account that placed the advertisement with the phone number associated with the suspected brothel on First Avenue South also placed classified ads for massage services using two other phone numbers.  The two other phone numbers were registered to either Defendant Liu or his wife.  The Citypages's customer account was registered in the last names Wang and Liu, with Wang as the primary name and Liu as the secondary name on the account.   The account was active and had been so for approximately one year. SA Christenson indicated that both Liu and Wang had a credit card on file with the newspaper, which were used to purchase over $11,000 in classified ads for massage services.

SA Christenson had conducted physical surveillance of the First Avenue South address at various times throughout various days prior to July 18, 2007.  Males were observed coming and going from the

3

address every 15 to 45 minutes.  Many of the males appeared nervous as they approached the address.  Vehicle registration checks revealed that the men visiting this address were from various communities thoughout the metropolitan area.

On July 19, 2007, SA Christenson returned to the First Avenue South address to find a "For Rent" sign in the front yard.  SA Christenson called the phone number on the "For Rent" sign and learned that the residence had been vacated and was available to rent.

On August 2, 2007, SA Christenson called the phone number from the classified ad that had been associated with the First Avenue South address and spoke to an Asian female.  The female advised that the massage services business was now located at an address on Morgan Avenue in Minneapolis.  On that day, SA Christenson conducted surveillance on the Morgan Avenue address and observed similar activity to the activity he observed at the First Avenue South address.

On August 8, 2007, ICE received an anonymous letter regarding an illegal prostitution operation run by Defendant Liu.  The letter stated that the prostitution business was run out of the Morgan Avenue address.  The letter indicated that the prostitution business used three different telephone numbers.  One of the telephone numbers matched the number utilized by the First Avenue South and Morgan Avenue brothels.  Another telephone number matched a number that had been listed in a classified ad purchased in the Citypages.  The letter also stated that Chinese women were flown into Minneapolis from other cities, then rotated to another location after two to three weeks.  Finally, the letter stated that a Kia Sorrento was used to transport women to the airport and prostitution out-calls.

On October 1, 2007, SA Christenson received information from Sgt. Snyder that the Minneapolis Police Department was also investigating a brothel at the Morgan Avenue address.  Sgt. Snyder indicated

that he had recently conducted visual surveillance on the Morgan Avenue address and determined that it had been vacated.  Sgt. Snyder called a number associated with the classified ad for the Morgan Avenue address and learned that the brothel had been moved to a hotel along I-494 in Bloomington.  In late November of 2007, ICE learned that Defendant Liu had been evicted from the Morgan Avenue address because a maintenance worker arrived to perform maintenance and was offered sex for money.

During Sgt. Snyder's visit to the vacant Morgan Avenue address, he searched through trash left behind at the residence.  In the trash, Sgt. Snyder found a rental agreement in the name of Defendant Liu for a property on West 61st Street in Minneapolis.  The rental agreement also indicated that Defendant Liu had previously lived at the First Avenue South address.  The owner of the West 61st Street address was contacted and indicated Defendant Liu had been evicted for running a prostitution business.

On October 3, 2007, law enforcement contacted the manager of the hotel along I-494 in Bloomington.  The manager was shown a picture of Defendant Liu and said that he was currently renting two rooms at the hotel.  The manager indicated that Defendant Liu was scheduled to check-out of the rooms on October 9, 2007.  The manager stated that men would show up to the rooms every 30 to 45 minutes and stay for approximately an hour.  She said Defendant Liu spent most of his time sitting in the parking lot in a white Kia Sorrento.  On October 5, 2007, Sgt. Wente, posing as a customer, went to one of the two rooms.  Sgt. Wente paid $80 for a massage and was advised that he would have to pay $80 more to receive sex.

On October 9, 2007, Defendant Liu checked out of the hotel and checked into another hotel along I-494 in Bloomington.  Again, Defendant Liu rented two rooms at the hotel.  On that same day, Sgt. Wente made another undercover visit where he received a massage and was offered sex for an additional $80.

5

During the visit, Sgt. Wente was told that the business would be at this new hotel until October 14, 2007, then the business would move to an apartment.

Soon after October 14, 2007, law enforcement learned, through calling the phone number in the classified ad associated with Morgan Avenue and First Avenue South addresses, that the prostitution business had been moved to an apartment on Park Commons Drive in Saint Louis Park. Law enforcement contacted the management for the Park Commons Drive apartment and received a copy of the lease for the apartment. The lease indicated that the apartment was rented to Defendant Liu. On the lease, Defendant Liu registered the white Kia Sorrento as being associated with the apartment. On October 19, 2007, law enforcement conducted surveillance of Defendant Liu and followed him to an address on Arona Street in Saint Paul. A public records search revealed that an apartment at the Arona Street address is leased to Defendant Liu.

On the morning of October 23, 2007, law enforcement followed Defendant Liu from the Arona Street address to the Park Commons Drive address. Defendant Liu spent nearly the entire day at the Park Commons Drive apartment. Defendant Liu did not leave until late in the evening when he drove an Asian female in the white Kia Sorrento to a hotel near the Minneapolis/Saint Paul Airport. The Asian female entered a hotel room and remained there for a short period of time. After the female left the hotel, law enforcement made contact with the man staying in the room. The man reported that he had just paid $200 to have sex with the Asian female.

Officers from the Bloomington Police Department conducted a traffic stop of the white Kia Sorrento as it left the hotel near the Minneapolis/Saint Paul Airport. The vehicle was stopped for an equipment violation. During the traffic stop, the driver was identified as Defendant Liu and the female

6

identified as Lisa Ling Li Liu.  A ticket for littering was issued to the female passenger.

Also on October, 23, 2007, Sgt. Wente made an undercover visit to the Park Commons Drive apartment.  As with the previous visits, Sgt. Wente paid $80 for a massage and was offered sex for another $80.  During the visit, the female performing the  massage on Sgt. Wente indicated that she was from New York and would only be in Minnesota for a short period of time.  The officer was able to get American Airlines passenger information off of the baggage claim ticket on luggage of the female performing the massage.  Law enforcement contacted American Airlines and using the passenger information learned that she was scheduled to depart Minnesota on November 5, 2007, to fly back to New York.

On November 5, 2007, law enforcement set-up surveillance on the Park Commons Drive apartment.  Law enforcement observed the female that provided Sgt. Wente with a massage get into a white Toyota sedan.  The female was driven to the airport and dropped off.  A records check revealed that the white Toyota sedan was a rental car.  Once the female entered the secured portion of the airport, law enforcement approached her and learned that she is a citizen of South Korea illegally in the United States. The woman was identified as Ky Pak ("PAK").

On November 6, 2007, PAK gave a statement to ICE agents.  PAK stated that Defendant Liu operates a prostitution business out of the Park Commons Drive apartment with Asian females that are both legally and illegally in the United States.  PAK stated that Defendant Liu arranges for females to come to Minnesota from other locations within the United States.  Defendant Liu transports the women to the airport and out-calls using a white Kia Sorrento.  However, she stated that Defendant Liu had switched to a rental car because the Kia Sorrento had been impounded during a prostitution arrest on November 1, 2007.  She also stated that she had been brought to the Arona Street apartment to receive payment for prostitution.

She stated she received payment at the Arona Street apartment because Defendant Liu kept money at that location.

Following the interview with PAK, law enforcement contacted the Plymouth Police Department to gather information about the arrest of Defendant Liu and impoundment of the Kia Sorrento on November 1, 2007. Plymouth Police reported that an undercover officer responded to an advertisement on Craigslist and arranged for a female to meet him at a hotel in Plymouth. An Asian female was brought to the hotel in a white Kia Sorrento driven by Defendant Liu. The female went into the hotel room where she agreed to perform a sex act on the undercover officer. Then, Plymouth Police arrested the female and Defendant Liu. It was determined that the female was illegally present in the United States. Plymouth Police booked and released both Defendant Liu and the female.

On November 20, 2007, SA Christenson and Sgt. Snyder were conducting surveillance on the Park Commons Drive apartment. During this surveillance, they were able to contact a man that had been visiting brothels run by Defendant Liu. This man indicated that he had been visiting brothels associated with the number listed in the Citypages classified ad. He stated that he had visited brothels located at the First Avenue South, the Morgan Avenue, and the Park Commons Drive addresses. He had also visited both hotels along I-494 in Bloomington. The man said that each time he paid to have sex with a different female. He indicated the females told him they were only in Minnesota for a short period of time.

Based on all the above facts, SA Christenson applied for a search warrant because he believed there was probable cause to believe that there was evidence of a crime at the Arona Street apartment, at the Park Commons Drive apartment, and inside the white Kia Sorrento. The search warrants were authorized by a United States Magistrate Judge on December 12, 2007. (Exs. 1-3.)

**B.      Allegedly False or Misleading Statements Within SA Christenson's Affidavit.**

During the hearing, the Court received testimony from SA Christenson regarding the veracity of some of the statements made in his affidavit in support of the search warrants.  Prior to the hearing, Defendant Liu's counsel submitted a letter detailing, by paragraph, the statements in SA Christenson's affidavit  that allegedly mislead the reviewing magistrate judge.

In paragraph 2 of his affidavit, SA Christenson provided a general overview of his investigation into prostitution operations involving women that are "aliens" within the meaning of relevant immigration laws. SA Christenson testified that Defendant Liu was not known by the investigators until February 22, 2007, and that Defendant Liu did not have involvement in all aspects of the investigation referred to in the overview.

In paragraph 3 of the affidavit, SA Christenson indicated that brothels have been uncovered in Apple Valley, Bloomington, and Minneapolis, with the assistance of confidential informants.   SA Christenson testified that in addition to PAK, two other confidential witnesses had come to the attention of law enforcement in late February of 2007.  All three of these witnesses provided information to law enforcement.  SA Christenson also testified that surveillance followed people working for the Apple Valley brothel travel to a Bloomington brothel.  The Bloomington brothel was operated by the man who shared the Citypages account with Defendant Liu.

In paragraph 5 of the affidavit, SA Christenson stated  that "Liu had a card on file with [Citypages]."  The statement in the affidavit does not indicate whether "Liu" refers to Defendant Liu or his wife, Xianghua Liu, although any other reference to Defendant Liu's wife in the affidavit has both her first and last name.  Defendant Liu submitted a investigative report from SA Christenson's co-case agent

regarding the search warrant executed on Citypages. (Def. Liu's Mem. in Supp., Addendum A, Docket No. 80.) The report indicates that the search warrant sought all records pertaining to advertising by Xianghua Liu. The report states that the Citypages account had two credit cards that could be used for payment. The report stated that the first credit card was a Visa card registered to a person named "Jie Ling Wang" and the second card was an American Express card registered to "Liu." At the hearing, SA Christenson testified that the Citypages billing statement only included the last name on the credit card, but he was pretty sure the American Express card was actually in the name of Defendant Liu.

In paragraph 6 of the affidavit, SA Christenson indicated that he had conducted "physical surveillance on [the First Avenue South address] on several occasions and [at] various times throughout the day." In an affidavit filed with the Court for another purpose, SA Christenson stated that he had "done physical surveillance on [the First Avenue South address] on several occasions and [at] various times throughout the day" and also stated that "[o]n July 19, 2007, [he] conducted surveillance on [the address] a second time," which only revealed the address had been vacated. (Def. Liu's Mem. in Supp., Addendum B, ¶¶ 12-13, Docket No. 80.) When questioned on the inconsistency between conducting surveillance on several occasions versus only twice, SA Christenson explained that he had only set up a formal surveillance operation on two occasions, but had conducted informal surveillance on several occasions. SA Christenson went on to explain that formal surveillance involves many officers being placed throughout the neighborhood, while informal surveillance involved his stopping to watch the house for a shorter period of time when he happened to be in the area.

In paragraph 25 of the affidavit, SA Christenson indicated that Defendant Liu was stopped by the Bloomington Police Department for an equipment violation. The previous paragraph in the affidavit

describes Defendant Liu bringing a woman to a hotel for prostitution just prior to the traffic stop. The Court has reviewed the video of the traffic stop. Bloomington Police were directed to execute a traffic stop of Defendant Liu in order to positively identify him and his passenger. The police drove for a number of minutes to catch-up to the white Kia Sorrento. At the time of the stop, the rear right brake light was not functioning.[3] During the stop, police checked Defendant Liu's identification and ordered the passenger out of the vehicle to obtain a video recording of her face for future identification. At the hearing, SA Christenson testified that the traffic stop was motivated by a desire to identify the passengers, not by an equipment violation.

In paragraph 28-30 of the affidavit, SA Christenson describes information received from PAK after she was intercepted at the Minneapolis/Saint Paul Airport. In paragraphs 26 and 27 of the affidavit, SA Christenson indicated that information regarding PAK's travel was obtained from her a baggage claim ticket on her suitcase during an undercover prostitution visit by Sgt. Wente and, from that information, law enforcement determined when she was scheduled to leave Minnesota. Sgt. Wente testified that he obtained the flight information through a seizure of the baggage claim ticket during an undercover visit to the Park Commons Drive brothel.

In paragraphs 6 and 9 of the affidavit, SA Christenson describes surveillance of the First Avenue South and Morgan Avenue addresses and cites his experience as assisting him in reaching the conclusion

---

[3]Defendant Liu claims that there was no problem with the rear brake light. However, the Court finds as a fact that the rear right brake light did not function. (See Def. Ex. 1.) Because the rear right tail light still functioned properly, it is more difficult to observe that the rear right brake light did not function. Moreover, SA Christenson testified that during the investigation, Defendant Liu was observed by surveillance taking the vehicle to have the brake light repaired.

that a brothel was operating out of the addresses.  During his surveillance, SA Christenson observed men frequently coming and going from the addresses.  He noted that the men would nervously approach the addresses and would stay for under an hour.  During the hearing, SA Christenson stated that he did not have any prior experience investigating brothel operations.  He also testified to a rather lengthy history in law enforcement and significant education history.

## C.    Trash Pulled from the Morgan Avenue Address.

Sgt. Snyder of the Minneapolis Police Department testified regarding a search and seizure of trash from the Morgan Avenue address on October 1, 2007.    Sgt. Snyder has been a member of the Minneapolis Police Department for over 12 years.  He was involved in the investigation of the prostitution operation involving Defendant Liu.

On October 1, 2007, he went to the Morgan Avenue address to investigate information he received that the premises had been vacated.  A witness had told Sgt. Snyder that the people moved out and left a trash can on the curb.  Sgt. Snyder observed two standard Minneapolis trash cans at the end of the driveway on the curb.  Sgt. Snyder searched the two trash cans and found a rental agreement for another property signed by Defendant Liu.

Sgt. Snyder continued to investigate the property, in part by entering the house though an open bathroom window, and determined that the premises had been vacated.  The only evidence obtained by Sgt. Snyder was from the trash cans at the end of the driveway.

## D.    Luggage Tag Seized from the Park Commons Drive Address.

Sgt. Wente of the Minneapolis Police Department testified about a seizure of a baggage claim ticket during an undercover visit to the Park Commons Drive address on October 23, 2007.  Sgt. Wente has

12

been a member of the Minneapolis Police Department for over 12 years.  Sgt. Wente participated in the prostitution investigation by posing as a customer for prostitution.

On October 23, 2007, Sgt. Wente, posing a customer, went to the Park Commons Drive address. When he arrived at the address he was escorted by a female, later identified as PAK to a room with a mattress and a small table.    PAK requested $80 for a massage, then asked Sgt. Wente if he would like to pay for "additional services," which was code for sexual intercourse.  Sgt. Wente stated that he wanted "additional services" and paid an additional $100.

Then, both Sgt. Wente and PAK undressed.  Sgt. Wente received a full body massage from PAK. After he received a massage, PAK handed him a condom.  At this point, Sgt. Wente indicated that he did not want to have intercourse, but rather desired to give PAK a massage.  He asked if she had any lotion that he could use in massaging her.  PAK checked on the table and did not find any lotion.  Then, PAK opened a closet and began searching through a suitcase.  PAK invited Sgt. Wente to help her look through the suitcase, which Sgt. Wente believed to belong to PAK.   After they were unable to find lotion in the suitcase, PAK went down the hall to a bathroom to check for lotion.   PAK did not find any lotion in the bathroom and Sgt. Wente proceeded to give her a lotionless massage.

After the massages, PAK assisted Sgt. Wente in dressing himself.  As PAK dressed him, Sgt. Wente noticed the baggage claim ticket on PAK's suitcase.  It was readily apparent to Sgt. Wente that this tag  would have evidentiary value in determining when and how PAK arrived in Minnesota.  Sgt. Wente feigned being faint and asked PAK to get him a wet cloth from the bathroom.  PAK went to get a wet cloth. While PAK was in the bathroom, Sgt. Wente took the baggage claim ticket off the suitcase. Later, Sgt. Wente was able to use the baggage claim ticket to determine when PAK would be leaving Minnesota.

By knowing PAK's departure date and time, law enforcement was able to apprehend PAK in the airport as she attempted to leave Minnesota.  It is highly unlikely that law enforcement would have been able to ascertain PAK's departure date and time without the information on the baggage claim ticket.

**E.      Statement by Defendant Liu on December 13, 2007.**

On December 13, 2007, SA Christenson questioned Defendant Liu.  The questioning took place shortly after Defendant Liu had been placed under arrest.  The questioning was conducted in a standard interview room at the ICE office located in Bloomington, Minnesota.  Also present in the interview room were Sgt. Grant Snyder and Minnesota Bureau of Criminal Apprehension Special Agent Donny Cheung.  SA Cheung was present to interpret the conversation into Mandarin Chinese for Defendant Liu because it was believed that he did not fluently understand English.  The interview was not recorded in any fashion.

Prior to asking any questions, SA Cheung went over *Miranda* rights with Defendant Liu in Mandarin Chinese.  SA Cheung read off a *Miranda* rights waiver form printed in Mandarin Chinese.  (Ex. 4.)  After reading the form, SA Cheung asked Defendant Liu if he understood the rights that he had read to him and if he would speak with them.  Defendant Liu indicated that he understood these rights and agreed to speak with them.  In addition to verbally agreeing to waive his *Miranda* rights, Defendant Liu signed the waiver form printed in Mandarin Chinese.

At some point during the questioning, SA Christenson went over potential ramifications of a conviction for his and his family's immigration status.  These ramifications included potential deportation of Defendant Liu's 18-year old son.  SA Christenson was unable to recall when during the questioning the potential immigration ramifications were discussed.

After 35 minutes of questioning, Defendant Liu stated that he wanted a lawyer.  At that time, the

14

questioning ceased.

**F.     Statement by Defendant Kraft on December 13, 2007.**

On the evening of December 13, 2007, SA Christenson, Sgt. Wente, and Sgt. Snyder arrested

Defendant Kraft from his place of employment on probable cause for state prostitution charges.  They

drove Defendant Kraft from his place of employment to the Minneapolis Police Station.  On the drive to

the police station, SA Christenson told Defendant Kraft that he wanted to give him some things to think

about during the ride to the station.  In giving Defendant Kraft things to think about SA Christenson told

Defendant Kraft that he would not go to jail on that day if he cooperated.[4] (*See* Transcript from March 5,

2008 at p. 33.)

Once at the police station, Defendant Kraft was brought to an interview room.  The interview room

was equipped with both audio and visual recording equipment that were in use.  (*See* Ex. 7.)  SA

Christenson, Sgt. Wente, and Sgt. Snyder were all present in the interview room.  They were all dressed

in plain clothes.  Prior to commencing any questioning, Defendant Kraft's cell phone was taken from him

and placed on the table out of his reach.

The interview began at approximately 8:00 p.m.  It began with SA Christenson making reference

to what he told Defendant Kraft on the ride to the Police Station.  Then, SA Christenson read to Defendant

Kraft from a *Miranda* waiver card.  Defendant Kraft initially responded that he did not have the money

---

[4]During the course of SA Christenson's testimony, he began to equivocate regarding what he
told Defendant Kraft about cooperation and spending the night in jail. (*See* Transcript from March 5,
2008 at p. 33-34, 39-42, 48, 50-53.)  The Court expressly finds that SA Christenson promised
Defendant Kraft that he would not spend the night of December 13, 2007, in jail if he cooperated, and
clearly told him he would go to jail that night if he did not cooperate.

for an attorney and did not know an attorney.  Then, SA Christenson responded by stating that Defendant

Kraft knew what they wanted to talk about and asked whether he was "ok" talking with them.  Defendant

Kraft still responded by stating that he did not know an attorney and did not have an attorney.  At this

point, Sgt. Snyder explicitly asked whether Defendant Kraft was waiving his right to an attorney.

Defendant Kraft replied that he did not have an attorney.  Sgt. Snyder re-asked whether he was waiving

his right to an attorney.  Defendant Kraft responded that he would not know who to call.  Sgt. Snyder then

asked if that response was a "yes."  Defendant Kraft confirmed that meant "yes" and then explained that

he did not have an attorney, nor would he know who to call.  Then, Defendant Kraft began answering the

questions that were put to him.

At the outset of the interview, Defendant Kraft was told that he was involved in a serious matter.

SA Christenson reminded Defendant Kraft that he had given him good advice on the way to the police

station.  SA Christenson indicated that he knew a lot more than Defendant Kraft might think the agents

knew.  SA Christenson told  Defendant Kraft that he did not have a clue what was coming down the road.

SA Christenson reminded Defendant Kraft that he had a beautiful wife, daughter, and newborn grandchild.

 Sgt. Snyder told Defendant Kraft that if he was not truthful, then the "night would end badly."  (Ex. 7.)

The questioning lasted for approximately two hours.  Just after 10:00 p.m., the interview ceased.

At that time, Defendant Kraft was presented with the *Miranda* waiver form and he signed the form.  (Ex.

6.)  Then, Defendant Kraft was released from custody.

## II.   CONCLUSIONS OF LAW

**A.**   **The Searches of the Arona Street Apartment, Park Commons Drive Apartment, and White Kia Sorrento are Supported by a Valid Warrant.**

Both Defendants challenge the search warrants issued in this case. Defendants claims that the warrants are not supported by sufficient probable cause. Defendant Liu challenges the truthfulness of SA Christenson in applying for the search warrants; this argument will be discussed in Part II.B. The Court disagrees that the search warrants are insufficient and recommends that Defendants' challenge to the search warrants be denied, for the reasons stated below.

### 1.   The Affidavit in Support of the Search Warrants Provided Probable Cause for the Issuance of Them.

Searches conducted pursuant to a warrant are reviewed to determine whether the information in the warrant application and supporting affidavit provided probable cause for the search. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Gates*, 462 U.S. at 236). When determining whether probable cause exists, a court does not evaluate each piece of information independently, but, rather, considers all of the facts for their cumulative meaning. *United States v. Allen,* 297 F.3d 790, 794 (8th Cir. 2002). The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also United States v. Salter*, 358 F.3d 1080, 1084 (8th Cir. 2004).

In reviewing the decision of the issuing court, this Court must ensure that the issuing court " 'had a substantial basis for . . . conclud[ing] that probable cause existed.' " *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir.2003) (quoting *Gates*, 462 U.S. at 238-39.)  Since reasonable minds may differ on whether a particular search warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir.1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

The Court concludes that, given the totality of the circumstances described in the affidavit in support of the search warrants, a reasonable person could believe there was a fair probability that evidence of a crime would be present at the Arona Street apartment, at the Park Commons Drive apartment, and inside the white Kia Sorrento.  The affidavit establishes a system of prostitution orchestrated by Defendant Liu that had been under investigation for months.  Confidential informants and undercover officers were used to confirm that a brothel was being run out of the Park Commons Drive apartment.  Law enforcement had followed Defendant Liu driving the white Kia Sorrento to bring women to prostitution out-calls and bring prostituted women to the airport.  Lastly, surveillance of Defendant Liu indicates that he resides at the Arona Street apartment.  Furthermore, PAK reported receiving money from Defendant Liu at the Arona Street apartment.  All of this information provided probable cause for the issuance of the search warrants.

2.       **The Good Faith Exception to the Warrant Requirement Applies to the Present Case and All Evidence Seized During the Execution of the Search Warrant is Admissible.**

Even if this Court were to determine that the application in support of the search warrant did not provide probable cause for the issuance of the search warrants, the agents who executed the search warrants did so in the good faith belief that the search warrants were supported by probable cause, as they

18

had been issued by a Magistrate Judge who determined that probable cause existed. The good-faith

exception to the exclusionary rule provides that evidence will not be excluded where police officers

reasonably rely on a search warrant issued by a neutral judicial officer, even if that search warrant is later

declared invalid. *See Leon*, 468 U.S. at 925-26. The Court finds that the agents in this case acted with

good faith. The agents in this case reasonably relied on the search warrants that were issued by a neutral

judicial officer. Even if the search warrants in this case was not supported by probable cause, the evidence

seized as a result of the execution of those search warrants is still admissible.

**B.** **Defendant Liu's Challenge to the Search Warrants Under *Franks v. Delaware* Fails Because the Affidavit in Support of the Search Warrant Contained No False Statements and the Challenged Statements Were Not Necessary for a Finding of Probable Cause.**

Defendant Liu challenges the search warrants issued in this case under *Franks v. Delaware*, 438

U.S. 154 (1978). In order to prevail on a challenge to a warrant affidavit under *Franks,* a defendant must

make a substantial preliminary showing that: (1) a false statement knowingly and intentionally, or with

reckless disregard for the truth, was included by the affiant in the affidavit, and (2) the allegedly false

statement is necessary to the finding of probable cause. *Id.* at 154-55; *United States v. Humphreys*, 982

F.2d 254, 258 n.2 (8th Cir. 1992) (citing *United States v. Lueth),* 807 F.2d 719, 726 (8th Cir. 1986).

Allegations of deliberate falsehood or reckless disregard must be accompanied by an offer of proof.

*Franks,* 438 U.S. at 156. A negligent mistake does not rise to the level of a *Franks* violation. *United*

*States v. Gladney*, 48 F.3d 309, 313 (8th Cir. 1995). To determine whether an affiant had a reckless

disregard for the truth, courts look to whether the affiant "in fact entertained serious doubts as to the truth

of the affidavits or had obvious reasons to doubt the accuracy of the information contained therein." *United*

*States v. Clapp*, 46 F.3d 795, 800 (8th Cir. 1995) (citing *United States v. Dorfman*, 542 F.Supp. 345,

369 (N.D. Ill. 1982)).

### 1.     The Challenged Statements Were Not False.

The Court concludes that statements in SA Christenson's affidavit that are challenged by Defendant Liu are not false statements. The Court reaches this conclusion because, after the evaluation of each challenged statement, the challenged statements are either factually accurate or not presented in a manner that misled the reviewing Magistrate Judge.

Defendant Liu claims that the general overview in paragraph 2 of the affidavit overstates the length of time he had been under investigation and his overall involvement in the investigation. The statement in paragraph 2 gives no information regarding the length or the scope of the investigation as it related to Defendant Liu. Therefore, neither the length of the investigation into Defendant Liu nor scope of his involvement in the investigation were misstated by paragraph 2 of the affidavit.

Defendant Liu claims the statements in paragraph 3 is false because only one confidential witness, PAK, was utilized and that no nexus had been established between himself and a brothel in Apple Valley. However, the statement in paragraph 3 of the affidavit is factually accurate. SA Christenson received information from three confidential witnesses and had established a link between Defendant Liu and a brothel in Apple Valley.

Defendant Liu claims that the statement in paragraph 5 is misleading because the credit card was in the name of Xianghua Liu, not Defendant Liu, and SA Christenson obscured this fact in his affidavit. However, the statement is consistent with the investigative report from SA Christenson's co-case agent. The report does not specify the first name on the American Express card. Based upon the investigative report, it is impossible to determine whether the American Express card is registered to the Defendant or

his wife.  While it still remains unclear whether the American Express card is actually in the name of Defendant Liu, his wife, or both of them, it certainly has not been shown that SA Christenson's statement that "Liu had a card on file with [Citypages]" is a false statement.

Defendant Liu claims that SA Christenson's statement in paragraph 6 that he had conducted surveillance at the First Avenue South address "on several occasions and various time throughout the day" is not truthful.  The Court does note the inconsistency in SA Christenson's affidavit from another matter, which stated that he conducted surveillance on several occasions at the First Avenue South address, then stated that he has only conducted surveillance twice at that location.  The Court finds SA Christenson's explanation that the statements were not inconsistent because he used the word "surveillance" to mean both "informal surveillance" and "formal surveillance" to be credible.  Therefore, the Court concludes that SA Christenson's statement that he conducted surveillance on several occasions at the First Avenue South address is truthful and not misleading.

Defendant Liu claims that, in paragraph 25, SA Christenson intentionally omitted the fact that the traffic stop was ordered by agents investigating prostitution, not by the routine patrol by the Bloomington Police.  It is apparent from the affidavit that the stop by Bloomington Police is connected to the prostitution investigation.  It is clear in the affidavit that the traffic stop happened immediately after Defendant Liu delivered a woman for a prostitution out call.  The context of the statement in paragraph 25 makes it clear that the traffic stop is a pretext for identifying the driver and passenger, therefore omitting this explicit explanation does not cause it to mislead the Magistrate Judge.  Furthermore, the Court finds that the statement about the equipment violation to be truthful.

Defendant Liu claims SA Christenson intentionally omitted from paragraphs 28-30 that PAK's

21

baggage claim ticket was seized by Sgt. Wente and the subsequent arrest of PAK was facilitated by the information on the baggage claim ticket. The affidavit does not explicitly state Sgt. Wente seized the baggage claim ticket, but this omission did not mislead the Magistrate Judge. It is clear from the affidavit that information gathered from the baggage claim ticket allowed law enforcement to determine when PAK would be leaving Minnesota. It was of little to no significance in reviewing the affidavits for probable cause whether the baggage claim ticket was actually seized or not.

Defendant Liu claims that SA Christenson's reference to his experience mislead the Magistrate Judge because this was his first investigation involving brothels. SA Christenson referenced his experience in determining that a continuous flow of nervous men to and from a residence is indicative of prostitution. The Court is convinced that SA Christenson has ample experience to draw from in making this conclusion. SA Christenson would not need extensive experience investigating brothels to reach this conclusion. The facts described by SA Christenson would lead a person with no experience investigating brothels and a person with a career of investigating brothels to the same conclusion. SA Christenson's reference to his experience did not cause to mislead the Magistrate Judge, nor did it have that intent.

As discussed further below, none of the statements challenged by Defendant Lui are required for the affidavit to establish probable cause. Indeed, the exclusion of these statements does little to detract from the central focus of the affidavit's storyline, i.e., the running of brothels by Defendant Liu . As there is no showing of a false statement made deliberately, or with reckless disregard for the truth, the Defendant has not met the requirements under the first prong of *Franks*.

2.      **The Affidavit Establishes Probable Cause Without the Inclusion of Statements Challenged by Defendant Liu.**

Even if Defendant were able to satisfy the first prong of the *Franks*' test and the challenged statements are deleted from the affidavit, more than sufficient content remains to establish probable cause. The affidavit still contains the results of visual surveillance that observed men coming and going from apartments rented by Defendant Liu. The affidavit contains information gained from a customer of the brothel stating that he paid for sex in the Park Commons Drive apartment. It includes surveillance of Defendant Liu driving a white Kia Sorrento from the Arona Street apartment to the Park Commons Drive apartment. The affidavit still has information from an undercover officer who actually visited the brothels. The information in the affidavit, excluding the challenged statements, still provided probable cause for the issuance of the search warrants. Given the strength of the remaining evidence, the Court finds that law enforcement had probable cause to conduct the searches permitted by the search warrants.

C.      **The Search of the Garbage at the Morgan Avenue Address is a Permissible Warrantless Search and Seizure.**

Defendant Liu contends that evidence from the search of garbage at the Morgan Avenue address should be suppressed. However, the warrantless search and seizure of garbage left at the curb outside of a residence is permissible. *California v. Greenwood*, 486 U.S. 35, 39 (1988). In *Greenwood*, the Supreme Court held that people did not have a reasonable expectation of privacy in garbage left on the curb for collection. *Id*. at 39-40. Thus, depositing garbage in an area for strangers to take, such as the trash collector, removes any possible expectation of privacy. *Id*. Because the trash was knowingly exposed to the public, it was not subject to Fourth Amendment Protection. *Id*. at 41. Even when the garbage is on a defendant's property, as opposed to the public curb, the search and seizure is permissible

23

when the trash is in public view and easily accessible. *See United States v. Trice*, 864 F.2d 1421, 1423-24 (8th Cir. 1988). As long as the garbage is readily accessible to the public, the Fourth Amendment does not prohibit the search and seizure of the trash. *See United States v. Comeaux*, 955 F.2d 586, 589 (8th Cir. 1992).

There is nothing in the evidence to distinguish between the instant case and *Greenwood*. Sgt. Snyder testified that the garbage cans were on the curb at the end of the driveway. Thus, Defendant Liu exposed the garbage to the public and he could not have a reasonable expectation of privacy in anything he left in the trash. *Greenwood* controls this issue and under that case the search and seizure was permissible under the Fourth Amendment and the evidence seized as a result of the garbage search need not be suppressed.[5] Defendant's motion to suppress the evidence seized from the garbage cans must be denied.

**D.     Sgt. Wente Legally Arrived in a Position to View the Baggage Claim Ticket and the Evidentiary Value of the Baggage Ticket Was Immediately Apparent.**

Defendant Liu challenges Sgt. Wente's seizure of the baggage claim ticket off PAK's suitcase. Evidence that is in plain view may be seized by law enforcment without a warrant. *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). In order to seize evidence without a warrant, police must be lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object. *Horton v. California*, 496 U.S. 128, 136-37 (1990). The incriminating nature of an item is immediately apparent if police have probable cause to believe

---

[5]During Sgt. Snyder's investigation of the Morgan Avenue address, he entered the residence through a window. Since he found nothing inside the residence, there is no need to resolve the legality of that entry.

it is evidence of a crime.  *Id*. at 136-37.

Sgt. Wente had been invited inside the Park Commons Drive apartment, therefore he was legally in a position to view the baggage claim ticket.  The incriminating nature of the baggage claim ticket was immediately apparent.  While a baggage claim ticket is usually an entirely innocuous item, here it was on the bag of a woman that had been transported from New York to Minnesota to engage in prostitution. Items relating to her airline travel to Minnesota are evidence of a crime, therefore the incriminating nature of this item is immediately apparent.

This case is distinguishable from *Arizona v. Hicks*, 480 U.S. 321 (1987), in that case the Supreme Court held that the plain view doctrine did not authorize a seizure or further search where the investigating officers only have a reasonable suspicion, but not probable cause, to believe the items found in plain view are evidence of a crime.  In *Hicks*, while lawfully in an apartment to investigate a shooting, policemen observed expensive stereo equipment that they reasonably suspected was stolen.  Without a warrant, they recorded the serial numbers of the equipment.  Using the serial numbers, the officers confirmed by telephoning police headquarters that at least one piece of the stereo equipment was stolen, and they seized it.

Here, Sgt. Wente did not need to take any further steps to confirm that the baggage claim ticket was evidence of a crime.  Sgt. Wente did not need to analyze the baggage claim ticket prior to realizing the evidentiary value, he immediately knew.  It was immediately apparent when he saw it and his immediate action to divert the attention of PAK is evidence that he was immediately aware of the evidentiary value.

Since Sgt. Wente viewed the baggage claim ticket from a position that did not violate any of the Defendant's Fourth Amendment rights and the incriminating nature of the ticket was immediately apparent,

Defendant's motion to suppress the warrantless seizure of the baggage claim ticket must be denied.

**E.     The Custodial Statements of Both Defendants on December 13, 2007, Are Challenged Under *Miranda*.**

Both Defendants challenge the admission of statements made during their custodial interrogations[6] on December 13, 2007.  Before any evidence obtained as a result of a custodial interrogation may be used against a defendant at trial, the Fifth Amendment requires that the  defendants be advised of his constitutional rights and that he make a knowing, intelligent and voluntary waiver of those rights. *Miranda v. Arizona*, 84 U.S. 436, 444 (1966).  A suspect in custody must be informed that he has the following rights: (1) the right to remain silent; (2) that his statements may be used against him in a court of law; (3) that he has the right to an attorney; and (4) that if he cannot afford an attorney, one will be appointed. *Id.* at 444, 478-479.  Law enforcement officials must use either this formulation of the warnings or "other procedures [that] are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it." *Id.* at 467.  Suspects need to be informed of these *Miranda* rights before questioning begins. *Id.* at 469-70.  Statements elicited from a suspect in violation of *Miranda* are inadmissible.  *Stansbury v. California*, 511 U.S. 318, 322 (1994).  After the warnings are given, if the suspect indicates that he wishes to assert these rights, the interrogation must stop. *Miranda*, 384 U.S. at 473-74.

After being informed of their *Miranda* rights, a suspect's waiver of their Fifth Amendment privilege against self-incrimination is only valid if it is voluntarily, knowingly, and intelligently made.  *Id.* at 444; *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002).  A waiver is knowing if it is "made with a full

---

[6]The Government concedes that both Defendants were in custody and subject to interrogation.

awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* It is the Government's burden to show by a preponderance of evidence that the suspect's waiver meets these standards. *Miranda*, 384 U.S. at 473; *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). While courts will not presume a waiver from a defendant's silence or subsequent confession alone, an express waiver is not necessary. *North Carolina v. Butler*, 441 U.S. 369, 373, 375-76 (1979)(explicit waiver not necessary to show defendant waived right to remain silent when defendant volunteered incriminating statements); *United States v. Barahona*, 990 F.2d 412, 418 (8th Cir. 1993)(valid waiver inferred even though defendant refused to sign waiver form because defendant clearly understood rights and was cooperative with police); *United States v. Duque*, 62 F.3d 1146, 1152-53 (9th Cir. 1995)(valid waiver inferred because, after having been given *Miranda* rights and asked if he was "of mind to speak with officers," defendant made incriminating statements).

1.  **Statement by Defendant Liu Is Admissible Because Law Enforcement Obtained It After a Valid Waiver of His *Miranda* Rights.**

Defendant Liu challenges the admissibility of statements made to law enforcement on December 13, 2007.[7] Defendant Liu challenges the validity of his *Miranda* waiver. Defendant Liu also challenges the voluntariness of his statement to law enforcement. This challenge is based upon discussion of immigration ramifications during the questioning. Defendant Liu seeks to suppress the statement because

---

[7]Defenadant Liu has withdrawn his motion as it relates to a statement on January 17, 2008, as the Government has no intention of utilizing any information from that statement.

the discussion of the immigration ramifications rendered the statement involuntary. Finally, Defendant Liu also asks that the statement be suppressed because it was not recorded.

It is clear, from the testimony of SA Christenson and signed waiver form, that Defendant Liu was advised of his *Miranda* rights in a language he understood, indicated that he understood his rights, and voluntarily and knowingly waived his rights. After being informed of his rights, Defendant Liu confirmed that he understood the *Miranda* rights both verbally and in writing. It was not until after being advised of his rights that the conversation with law enforcement took place. There is no evidence to suggest that Defendant Liu's decision to speak after being advised of his rights was not the product of a free and deliberate choice. Furthermore, SA Christenson immediately ceased the interview upon Defendant Liu's request for a lawyer. Based upon the totality of these circumstances, the Court concludes that Defendant Liu made a knowing and voluntary waiver of his rights under the Fifth Amendment.

Defendant Liu's statement was voluntary. While SA Christenson discussed immigration ramifications, there is no evidence that Defendant Liu was told his decision to talk to SA Christenson would have any impact on his or his family's immigration status. There is no evidence that SA Christenson used any discussion of immigration ramifications to coerce a statement. To the contrary, the evidence shows that SA Christenson only sought to inform Defendant Liu of the impact that his arrest and potential conviction would have upon his immigration status.

The Court declines Defendant Liu's invitation to upset the law regarding the recording of statements in federal cases. Defendant Liu acknowledges that federal law does not require statements to be recorded. However, Defendant Liu encourages the Court to join 38 other states in imposing a recording requirement. While this Court agrees that recording statements made by suspects subjected to custodial interrogation

28

is good public policy, federal constitutional law does not require it.  In federal court, the Government bears the burden of establishing a valid waiver of *Miranda* rights and the voluntariness of the statement.  To be certain, the Government has a much easier task of meeting this burden when the statement has been recorded.  When a decision to not record is made, the Government abandons the best evidence regarding *Miranda* and voluntariness issues and must meet this burden through other, often times less reliable, evidence.  This Court lacks the power to impose its concept of good public policy on the executive branch.  Here, the Government has met its constitutional burden with the signed waiver form and the testimony of SA Christenson.

> **2.** **The *Miranda* Waiver and Statement from Defendant Kraft Is Inadmissible Because It Was Obtained Through Coercion.**

Defendant Kraft challenges the validity of the waiver of his *Miranda* rights.  Defendant Kraft asserts that the *Miranda* waiver was not voluntary and that he did not agree to waive his rights because he asserted his right to counsel.  Defendant Kraft also claims that the statement itself was not voluntary.  The Court concludes that Defendant Kraft did not voluntarily waive his *Miranda* rights and that the confession was not voluntary.  Because the Court recommends that Defendant Kraft's statement be suppressed as not voluntary, it is not necessary to reach the issue of waiver of the right to counsel.

The Government bears the burden of establishing by a preponderance of the evidence that Defendant Kraft voluntarily waived his *Miranda* rights.  In determining voluntariness of the waiver, "[t]he proper inquiry is whether the *Miranda* waiver 'was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Perry v. Kemna*, 356 F.3d 880, 886 (8th Cir. 2004) (quoting *Moran*, 475 U.S. at 421; *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998)).  In this case,

Defendant Kraft's waiver of his *Miranda* rights was obtained through intimidation and coercion. Defendant Kraft was arrested in the evening at his work place. He was promised by law enforcement that if he cooperated, then he would not spend the night in jail. This promise also served as a threat; if he did not cooperate, for example, if he asserted his rights under *Miranda* and declined to speak to law enforcement, then he would go to jail. Defendant Kraft's waiver of his rights under *Miranda* cannot be considered voluntary as it was clear that his liberty on that evening depended on his decision to waive his rights. Since Defendant Kraft's statement was not preceded by a voluntary waiver of his rights under *Miranda*, his statement to law enforcement must be suppressed.

The fact that these statements should be suppressed under *Miranda* is not the end of the inquiry. The remedy for a *Miranda* violation is to exclude the unwarned statement from use as evidence at trial in the prosecution's case-in-chief. *United States v. Patane,* 542 U.S. 630, 641-42 (2004). However, a statement suppressed because of a *Miranda* violation may be used for the purposes of impeachment. *Harris v. New York*, 401 U.S. 222, 224 (1971). If the statement is suppressed because it is not voluntary, then it is not admissible for any purpose, including impeachment. *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978). Also, the remedy for a *Miranda* violation does not extend to the fruits of unwarned testimony, but the fruits of an actually compelled statement must be suppressed. *Patane*, 542 U.S. at 639. The Court must determine whether Defendant Kraft's statements were simply taken without a valid *Miranda* waiver, though not actually compelled, or whether his statements were actually compelled.

If the statements are induced by threats, promises, or in any other way in which the suspect's will is overborne, the statements are not voluntary and are inadmissible for any purpose. *See Haynes v. Washington*, 373 U.S. 503, 513 (1963). In making this determination, courts will inquire into the totality

of the circumstances in assessing the conduct of law enforcement officials and the suspect's capacity to resist any pressure. *United States v. Kilgore*, 58 F.3d 350, 353 (8th Cir. 1995) (citing *United States v. Meirovitz,* 918 F.2d 1376, 1379 (8th Cir.1990)).   The voluntariness inquiry centers upon: (1) the conduct of law enforcement officials in creating pressure; and (2) the suspect's capacity to resist that pressure.  *United States v. Jorgenson*, 871 F.2d 725,  729 (8th Cir.1989) (citing *Connelly*, 479 U.S. 157 ).

In the present case, the Government has not met its burden of showing that Defendant Kraft's statements were not induced by threats or promises, or that Defendant Kraft's will was not otherwise overborne.  Based upon the totality of the circumstances, Defendant Kraft's statement was obtained after a *Miranda* waiver was obtained though threats and coercion.  Defendant Kraft was given advice by SA Christenson on the ride to the police station.  There is no record of the precise advice given, but the Court has found that Defendant Kraft was promised that if he cooperated he would not go to jail and, thereby, threatened that if he did not cooperate he would go to jail.  On the video of the interrogation, Sgt. Snyder gave an ominous  warning that "the night will end badly" if Defendant Kraft is not truthful with them.  The advice on the ride to the police station, coupled with the video of the statement, makes clear that Defendant Kraft was intimidated into speaking with law enforcement.  The video shows an exploitation of the promise to go home if he cooperated and of the threat that "the night will end badly" if he did not cooperate.  Further, SA Christenson attempted to impress upon Defendant Kraft the seriousness of the situation by talking about Defendant Kraft's family, which was utterly immaterial to the questions that he wanted Defendant Kraft to answer.  Based upon these circumstances, the Court concludes that Defendant Kraft's will was overborne by the threats and promises of law enforcement and his statement was involuntary.

Since Defendant Kraft's statement is involuntary, it must be suppressed and not admissible for any purpose at trial.

## III.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Liu's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [#37], Defendant Liu's Motion to Suppress Statements, Admissions, and Answers [#38], and Defendant Kraft's Motion for Suppression of Evidence Obtained as a Result of Search and Seizure [#47] be **DENIED** and Defendant Kraft's Motion for Suppression of Admissions or Confessions [#58] be **GRANTED**.

DATED: April 7, 2008                              *s/ Franklin L. Noel*
                                                  FRANKLIN L. NOEL
                                                  United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **April 17, 2008**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **April 17, 2008,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.